Filed 5/26/16  In re C.W. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re C.W., a Person Coming Under the Juvenile Court Law. | |
| HUMBOLDT COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. J.G., Defendant and Appellant. | A145990 (Humboldt County Super. Ct. No. JV-120064) |

JG, mother of CW, appeals from juvenile court orders, dated July 21, 2015, which denied her Welfare and Institutions Code[1] section 388 petition and terminated her parental rights, thereby freeing CW for adoption.[2]  Mother challenges the orders on various grounds, none of which warrants reversal.  Accordingly, we affirm.

---

[1]     All further unspecified statutory references are to the Welfare and Institutions Code.

[2]     The juvenile court also terminated the parental rights of the child's alleged fathers, DTW and ZG, and any and all persons claiming to be the father of the child.  No father has filed a notice of appeal.

## 1.     Shasta County Juvenile Dependency Proceedings

On October  21, 2011, the Child Protective Services (CPS) division of the Shasta County Health and Human Services Department filed a section 300 juvenile dependency petition asking the court to find CW (the child) came within its jurisdiction under subdivision (b) (failure to protect).  (§ 300, subd. (b).)  The petition alleged, in pertinent part, that the 26-year-old mother and the child (born October 2011) had tested positive for opiates at the time of the child's birth, and mother's substance abuse problem impaired her ability to provide adequate care for the child.  CPS social workers initially recommended that CW remain in mother's home and that mother be provided with services to treat her substance abuse problem.  Mother agreed with the agency that she and the child would reside in the home of CW's maternal great grandparents.

A month later, on November 2, 2011, the Shasta County juvenile court held a detention hearing.  CW's maternal great grandparents reported that mother had absconded with the child and their whereabouts were unknown.  The juvenile court found sufficient cause to issue a detention order and a protective custody warrant for CW.  Four months later, on February 22, 2012, mother and four-month-old CW were located in Humboldt County.  The child was placed in the care of the Humboldt County Department of Children and Family Services (the agency) and the case was transferred back to Shasta County.

At a March 27, 2012, jurisdictional hearing in Shasta County, mother submitted a waiver of rights form and admitted to using drugs immediately before the child's birth. The court assumed jurisdiction over CW and transferred the matter to Humboldt County for a dispositional hearing.  Humboldt County juvenile court accepted the transfer on April 17, 2012.

---

[3]     We set forth only those facts as are necessary to resolve this appeal.

### B. Humboldt County Juvenile Dependency Proceedings

#### 1. Background

On May 8, 2012, the Humboldt County juvenile court held an uncontested dispositional hearing. The court declared six-month-old CW to be a dependent of the court. By the date of the dispositional hearing mother had secured stable housing at the Multiple Assistance Center (MAC) and was participating in substance abuse treatment through the Healthy Moms program. The juvenile court returned the child to mother's custody and ordered the agency to provide family maintenance services. As part of her case plan, mother was required to not use any illegal drugs, to comply with all required drug tests, and to maintain stable housing.

Within a month of the dispositional hearing, mother had absconded with CW, ceased all contact with the agency, and stopped participating in services offered by the MAC and the Healthy Moms program. Consequently, on June 29, 2012, the agency filed a section 387 petition based on mother's failure to comply with the case plan and her act of absconding with CW. The juvenile court issued a protective custody warrant for CW. The warrant remained outstanding for the next two years, during which time CW's whereabouts were not known to the agency.

During the search for CW, the agency's social workers learned that mother had given birth to a second child (CW's sibling) in March 2013. Both mother and CW's sibling tested positive for drugs. The agency filed a section 300 petition on behalf of CW's sibling, who was declared a dependent of the court on May 21, 2013. Mother failed to meet with agency social workers and never appeared for any court hearings related to CW's sibling. Mother's parental rights to her second child were terminated on March 19, 2014, thereby freeing that child for adoption.

In September 2014, mother gave birth to a third child, who died within hours of birth. During the investigation of the death of the third child, Humboldt County law enforcement officers were informed of the outstanding protective custody warrant issued for CW. The child was ultimately found on September 8, 2014, when police officers responded to a report of a naked child wandering alone in a motel parking lot. Mother

was found asleep in a motel room and was unaware that CW had left the room. Mother was arrested for child endangerment and for being under the influence of a controlled substance. CW was taken into protective custody. The agency filed a supplemental section 387 petition, and CW was detained and placed in the same foster care home as CW's sibling. After a detention hearing, the court continued CW's placement in foster care and ordered the agency to provide mother with reunification services, including, drug monitoring, random drug screens, and substance abuse assessment and treatment.

On October 15, 2014, a jurisdictional hearing was held on the agency's supplemental section 387 petition. Mother submitted on the issue of the court's jurisdiction and waived her rights to a hearing and to present witnesses. The juvenile court sustained the allegation in the supplemental section 387 petition, as amended, assumed jurisdiction of CW, and continued the child's out-of-home placement. The court also continued its previous orders including the directives regarding mother's reunifications services.

Five months later, on March 4, 2015, the juvenile court held a contested dispositional hearing. The court considered the agency's reports received by the court on November 14, 2014 and February 2, 2015, and the testimony of mother and Susie Cha, the agency social worker assigned to the case. The juvenile court found that mother had failed to reunify and her parental rights were terminated with respect to CW's sibling; mother had on one or more occasions willfully abducted CW and refused to disclose the child's location; mother had not complied with her case plan and had made minimal progress toward alleviating or mitigating the causes necessitating intervention by the juvenile court; mother's substance abuse placed CW at a substantial risk of harm; and, further found, by clear and convincing evidence, that returning CW to mother would create a substantial risk of detriment to the child. The juvenile court ordered that CW remain a dependent of the court, and scheduled a section 366.26 hearing for July 1, 2015, to determine the child's permanent placement. Although the court ordered no reunification services for mother after finding that services were not in the child's best interests, mother was granted supervised visits of two hours per month.

4

## 2. Section 366.26 Agency Report and Section 388 Petition and Opposition

Before the section 366.26 hearing, the agency submitted a report, received by the court on June 8, 2015, recommending termination of mother's parental rights and adoption as CW's permanent plan. Agency social worker Susie Cha reported that CW, then three years and eight months old, was "happy and healthy," and "developmentally on target." Mother had supervised visits for several hours a month. The visits consisted of mother interacting with child and bringing the child snacks or sweet treats. The child had difficulties following the mother's directions and required a lot of re-direction and verbal prompting to stop negative behaviors.

Cha also reported on CW's placement history: "From 09/10/2014 to 05/11/2015, [CW] was placed with non-related extended family members. [The child] changed placement on 05/11/2015 due to a domestic violence incident that occurred in the home where [the foster care father] was upset and used a chainsaw to cut a dresser. [The child] did not witness this incident and was in a different area of the home. [The child] was removed from that home and is currently placed with a relative." As to the likelihood that CW would be adopted if parental rights were terminated, Cha reported the child "is an adoptable child. The previous [foster care mother] is willing to adopt and is likely to be approved for adoption so long as there are no more disruptions in the home."

Cha concluded her evaluation by stating: "[CW] has been in foster care with [the child's] sibling since 09/10/2014. Although [CW] is in a new placement with a relative, [the child] has become bonded with [the] previous [foster care mother] and [the child's sibling]. The previous [foster care mother] is committed to provid[ing] [CW] with a safe and nurturing environment and has diligently worked with the [agency] to mitigate placement disruptions. [CW's] current placement provider and the [agency] are in full support of [CW] and [the child's sibling] returning to [the] previous placement after the previous [foster care mother] completes and passes the home study."

An adoption assessment addendum to the section 366.26 report was received by the court on June 10, 2015. Agency social worker Jim Bragg, who prepared the assessment, concurred with Cha's opinion that CW was likely to be adopted if parental

5

rights were terminated. Bragg also reported that CW was placed with the child's sibling on September 10, 2014, and the children had developed a strong bond. The two children were both adoptable and would continue to be placed together with a plan of adoption. The Lilliput Family Services adoption home study social worker provided preliminary information indicating that there was a strong likelihood CW's previous foster care mother would be approved after an adoption home study.

On June 11, 2015, mother filed a JV-180 form petition under section 388, seeking to vacate the court's orders denying reunification services and scheduling the section 366.26 hearing. The section 388 request was prompted by the following changes: (1) CW had been removed from the foster care placement with the child's sibling and placed in a "non-concurrent home" of a paternal aunt on May 11, 2015; (2) mother had been "5 months clean and sober, " and now had a substance abuse sponsor; (3) CW stated a desire to live with mother; and (4) mother had retained "a personal [therapist] to provide her with counseling and parenting training." Mother asked the court to issue new orders directing the agency to transition CW to mother's care pursuant to a family maintenance plan, or alternatively, directing the agency to provide mother with reunification services. Mother asserted that the new orders would be better for CW because the child was "highly bonded" with mother and wanted to return to mother's home, and termination of parental rights would sever this important bond and would be highly detrimental to the child.

On June 16, 2015, the agency filed a written opposition to mother's section 388 petition, arguing that mother had failed to provide and could not provide evidence to support her allegations that there had been a change in circumstances or that efforts at reunification were in CW's best interests. On June 30, 2015, the child's court-appointed special advocate (CASA) submitted reports opposing mother's section 388 petition, and agreeing with the agency's recommendation that the court terminate mother's parental rights and proceed with the adoption process, pursuant to section 366.26.

### 3. Combined Section 388 and Section 366.26 Hearing

On July 15, and 16, 2015, at the request of mother's counsel, the juvenile court held a combined hearing addressing mother's section 388 petition and the agency's recommendation to terminate parental rights and determine a permanent plan for CW pursuant to section 366.26.

Mother testified, and acknowledged, that CW tested positive for opiates at birth, and that she (mother) was using drugs on a daily basis while the child was initially in her care from October 2011 to February 22, 2012, and after mother absconded with the child, from May 9, 2012 to September 8, 2014, mother continued to use drugs for most of this time period. During the times that the child was in mother's custody, mother was the child's primary caregiver. At the time CW was found by the police on September 8, 2014, mother had just been released from the hospital after the birth of her third child and she was staying at a motel with CW and another person who was taking care of CW. Mother explained that CW's caregiver had left the motel room, mother had fallen asleep without locking the door, and the child left the room.

Mother described her efforts to overcome her substance abuse problem. She admitted she actively used drugs during all of her pregnancies and had been in severe denial about her substance abuse problem. In October 2014, mother started to attend Narcotics Anonymous (NA) and Alcoholics Anonymous (AA) meetings and in February 2015 she started to attend an outpatient drug treatment program. However, she was not really serious about drug treatment until reunification services were terminated at the last court hearing in March 2015. Mother's latest sobriety date was January 25, 2015, when she last used marijuana. At the time of the July 2015 hearing, mother was participating in drug treatment services: she had just completed step four of a 12-Step program, and she had completed four sessions of a therapy-based parenting skills class. After refreshing her memory by looking at slips of paper purportedly verifying her attendance at NA

meetings (marked as Exhibit 1), mother testified that since March 2015 she had attended 75 NA meetings and had obtained a NA sponsor. [4]

Mother also testified concerning her supervised visits with the child. The visits were initially once a week, for four hours, but after the March 2015 hearing the visits had been reduced to once a month for two hours. Mother attended most of those visits. The child called mother "mom" or "mommy," and was very affectionate. Mother claimed that without her prompting, the child asked to go home on several occasions during visits, including the visits on June 1, 2015 and July 1, 2015. The court admitted into evidence photographs of mother and CW, most of which were taken during visits after the March 2015 hearing.

Mother testified that she wanted to see CW more often and she was requesting only that reunification services be resumed, not immediate custody. Mother currently resided with CW's maternal grandmother, who had completed a drug treatment program in May 2015. Mother was planning to attend college to complete an associates degree.

RK, the child's maternal great grandfather, testified regarding mother's visits with the child. RK was present at all visits, and observed the child calling mother "mom" or a nickname. He believed mother and the child were "close" and had a "good relationship." To RK's knowledge, mother never had a visit alone with the child. RK provided the snacks for the child's visits.

Agency social worker Cha testified she was first assigned the case in 2012 when the matter was transferred from Shasta County; mother had absconded with CW and there were concerns about mother's substance use. Mother was once again offered

---

[4]    Mother sought to admit a letter from her NA sponsor dated June 25, 2015, and marked as Exhibit 2. Mother's counsel argued that the court should consider the letter despite the fact that it was hearsay because counsel was unable to subpoena the sponsor who was not allowed to disclose her identity under the rules of NA. The court excluded the letter after finding that counsel had failed to offer sufficient reasons to allow its admission over a hearsay objection. Nonetheless, the court surmised that the sponsor's letter would state that mother was working diligently and was dedicated to working on a 12-Step program and resolving her substance abuse issues, which seemed "to be relatively evident from [mother's] testimony."

services but she absconded with CW for a second time.  Cha next had contact with mother in September 2014.

Cha testified regarding mother's visits with CW.  The child referred to mother as either "mom" or by mother's first name.  The agency's visitation superior reported that CW often called the biological mother by her first name and the foster care mother was called "mom."  Cha believed there was a connection and bond between mother and the child.  The child talked about going to mother's home during visits but Cha denied any knowledge that the child wanted to live with mother.

Cha also testified regarding CW's placements.  As noted in the agency's report, CW and the child's sibling had been in the same foster care home from September 2014 until May 2015, when the child was removed due to the conduct of the foster care father.  By the end of June 2015, however, CW had been returned to the foster care home and CW and the child's sibling were again living in that home at the time of the July 2015 hearing.  The foster care parents were currently separated, the foster care father was no longer residing with the foster care mother, and the foster care mother wanted to adopt both children.  Cha believed the siblings were bonded and had a good connection with each other.

After argument by counsel but before rendering its decision, the juvenile court made the following comments:  "Well, this is an extremely difficult case . . . . [Mother] has made very admirable efforts. . . .  [F]rom the analysis of a [section] 388, there's got to be a change in circumstances.  And I don't know if I could characterize these as . . . changed circumstances or changing circumstances. [¶] I think anyone that [has] had such a lengthy battle with controlled substances is always changing rather than changed. . . . [T]hat's a life-long battle that [mother will] have to struggle with.  I think that's my definition, to a certain extent.  So, I don't know." [¶] The second prong of a [section 388] is what's in [the] best interests of the child.  And, obviously, that's the heart of all of this.  It comes down to the beneficial [parent-child] relationship exception as well.  [Mother] has had regular visitation.  Visitation, apparently, has been good.  It's all been supervised visitation, and that's primarily a function of trust.  Can't trust somebody who has on at

9

least two occasions succumbed to their addiction rather than the best interests of the child." The juvenile court was "particularly concerned in this case with the fact that services have been in place since 2011, or at least offered since 2011. And it's not a matter that mother just simply couldn't take advantage of them, she vigorously and intentionally and purposefully avoided those services that might have otherwise helped her." The court noted that but for mother's conduct of refusing to acknowledge her drug problem and absconding with CW for a period of three years, essentially all of the child's life, it was more likely than not that the court would have terminated services several years earlier and CW would have been in a permanent setting and on the way to the stability that the child clearly did not have at that time. Albeit, the court noted that despite mother's conduct CW had overcome a lot of obstacles and was a very resilient child. The juvenile court also stated it would take into consideration CW's bond with the child's sibling. The court had concerns about CW's placement in the current foster care home and noted there were issues that would have to be addressed before the court would be willing to grant an adoption to CW's current foster care mother. But, having said that, the court thought CW was "clearly an adoptable child. And whether it's that particular home or another home, the Court ha[d] to weigh the benefit to [CW] of that permanency and the movement beyond the chaotic lifestyle that [CW had] been exposed to, to this point, [as being] more beneficial to [CW] than th[e] bond that [CW] ha[d] [with the] mother." The court concluded its remarks by noting that its focus was not necessarily on mother's reunification but on what CW needed to move forward in a successful fashion. The matter was continued to July 21, 2015 for the court's decision.

At the continued hearing on July 21, 2015, the juvenile court denied mother's section 388 petition and terminated her parental rights pursuant to section 366.26. The court noted it had read and considered mother's section 388 petition, the issue statements of counsel, pretrial statements of counsel, the agency's section 366.26 report received on June 8, 2015, the agency's adoption assessment received on June 10, 2015, the CASA's response to mother's section 388 petition and the CASA's report and recommendation for the section 366.26 hearing received on June 30, 2015, as well as the evidence adduced at

10

the hearing and the arguments of counsel. In support of its rulings, the court made the following comments: "[F]rankly, this is [a] very, very close, that [is,] [it is] an extremely difficult decision . . . from [the court's] perspective. [¶] I think that mother has done a good job of realizing something, a lifestyle that's been absolutely disastrous for her children. . . . [T]his is probably one of the more serious or gravest cases I've ever considered.  I'll soften that a little bit. . . . I've seen grave situations, but one that has been so intentional and has resulted in such trauma, that's relatively rare.  And I think it's a razor-thin, close call. [¶] . . . One of the things that I've taken some solace in, although, there's not a lot of solace to be found here, is that across the board, minor's counsel, CASA, the [agency], have all recommended a particular course of action. . . ."  The court found that given the depth of mother's problems, circumstances were changing but had not changed as required under section 388.  As to CW's best interests, the court found that mother had regularly visited CW.  However while mother had done a good job "to this point," she had not managed to gain the trust of either the agency or the court in liberalizing her visits to unsupervised visits.  The court attributed the lack of trust to mother choosing her addiction over CW and the child's sibling, and in particular, CW, who had borne the substantial brunt of mother's choice.  Consequently, mother's choice caused the court "to tip the balance toward permanency for [CW]."  The court adopted the findings and orders in the agency's section 366.26 report, which included terminating parental rights after finding, by clear and convincing evidence, that CW was likely to be adopted, and determining that adoption was the appropriate permanent plan for CW.  Mother's timely appeal ensued.

## DISCUSSION

### I.      Denial of Mother's Section 388 Petition

"Section 388 permits a parent to petition the juvenile court on the basis of a change of circumstances or new evidence for a hearing to change, modify or set aside a previous order in the dependency.  The parent bears the burden of showing both a change of circumstances exists and that the proposed change is in the child's best interests. [Citation.]"  (*In re Casey D*. (1999) 70 Cal.App.4th 38, 47 (*Casey D*.).)  However, when a

section 388 request comes late in the proceeding following the termination of reunification services, like in this case, "the parent['s] interest in the care, custody and companionship of the child are no longer paramount.  Rather, at this point 'the focus shifts to the needs of the child for permanency and stability.'  (*In re Marilyn H.* [(1993)] 5 Cal.4th 295, 309), and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child.  (*Id*., at p. 302.)"  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).)  Thus, the juvenile court here appropriately recognized that by the time mother had filed her section 388 petition the focus had shifted from reunification to CW's best interests.  (*Stephanie M., supra,* at p. 317.)

The determination of where the child's best interests lay is "committed to the sound discretion of the juvenile court."  (*Stephanie M., supra*, 7 Cal.4th at pp. 318.)  We will not disturb a juvenile court's ruling "unless an abuse of discretion is clearly established.  [Citations.] . . .  And [our Supreme Court has] . . . warned: '. . . When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the [juvenile] court.'  [Citations.]"  (*Id*. at pp. 318-319.)

In challenging the juvenile court's finding that she did not demonstrate changed circumstances, mother argues the court abused its discretion by considering her two failed attempts at drug treatment programs in 2011 and 2012.  According to mother, the court should have only considered her "resolved commitment to drug treatment services after January 2015," and her "renewed determination after the March 4, 2015, hearing."  However, "[i]n considering whether a juvenile court abuses its discretion in denying a section 388" petition, "[i]t is only common sense that . . . the gravity of the problem leading to the dependency, and the reason that the problem was not [previously] overcome . . . must be taken into account."  (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531.)  Mother also complains that the juvenile court's comments about a drug addict's life-long struggle to overcome addiction suggest that the court believed a recovering drug addict could never prove changed circumstances for the purpose of modifying a prior court order.  However, when read in context, the juvenile court's

12

comments merely evidence its recognition that where substance abuse is a central issue, the court has a duty "to evaluate the likelihood that [mother] would be able to maintain a stable, sober and noncriminal lifestyle for the remainder of [CW's] childhood. [Mother's] belated compliance with reunification efforts is not definitive on this issue." (*In re Brian R.* (1991) 2 Cal.App.4th 904, 918.) The juvenile court commended mother, as do we, for her efforts to address her long-standing substance abuse problem. However, the juvenile court reasonably found that mother had not undertaken those efforts in time for CW to significantly benefit. Given mother's substance abuse history, the juvenile court reasonably found that mother's few months of sobriety "against [her] previous failings," did not show sufficiently changed circumstances requiring a resumption of reunification services. (*Ibid.*)

We also reject mother's contention that the juvenile court abused its discretion by finding that additional reunification services would not be in CW's best interests. Mother's challenge to the court's ruling is based on isolated portions of the documentary and testimonial evidence. However, our limited power of review requires us to "accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact." (*Casey D., supra*, 70 Cal.App.4th at p. 53.) By the time of the July 2015 hearing, mother was in the midst of a 12-Step drug treatment program. She had not progressed beyond supervised visits with CW who had been detained since September 2014. The juvenile court was not required to grant mother's petition simply because she had a bond with CW. Although mother asked for a resumption of reunification services, the juvenile court could reasonably find that mother had not demonstrated that such services would actually benefit CW. Nor was there any evidence that CW was likely to suffer harm from the denial of reunification services. Given CW's need for stability and a permanent home, and the uncertainty that mother would be successful in addressing her substance abuse problem, the juvenile court properly decided that mother had not sufficiently demonstrated that it would be in CW's best interests to grant mother's section 388 petition. Mother's attempts to reargue the evidence are insufficient to justify setting aside the denial of the section 388 petition.

13

Nor do we see anything in the cases cited by mother from which we can conclude that the juvenile court was required, as a matter of law, to find that CW's best interests and need for permanency and stability would be promoted by granting mother's section 388 petition. Accordingly, we must uphold the denial of mother's section 388 petition.

## II.    Termination of Mother's Parental Rights

At a section 366.26 hearing, once a juvenile court has determined by clear and convincing evidence that a child is adoptable, as in this case, it is required to terminate parental rights unless the parent can establish that there is a compelling reason for concluding that termination would be detrimental to the child because (1) a parent has maintained regular visitation and contact with the child, and (2) the child would benefit from continuing the relationship. (§ 366.26, subd. (c)(1)(B)(i).) We review the juvenile court's decision whether to apply the beneficial parent-child relationship exception to termination of parental rights for an abuse of discretion. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348–1349 (*Jasmine D.*).)

Mother argues that she met the requirements of the beneficial parent-child relationship exception to termination of her parental rights because the juvenile court agreed that she had regular visits with CW and a positive relationship with the child. However, to meet her burden of proving that termination of her parental rights would be detrimental to CW, mother was required to do more than show "frequent and loving contact, an emotional bond with the child, or pleasant visits. [Citation.]" (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229 (*Dakota H.*).) As one court has explained, "[t]o overcome the preference for adoption and avoid termination of the natural parent's rights, the parent must show that severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed. [Citations.]" (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*Jasmine D., supra*, 78 Cal.App.4th at p. 1350.) This is not such a case. Mother

14

proffered no evidence demonstrating CW would be harmed, let alone greatly harmed, if parental rights were terminated so that the child could be adopted.

Mother also argues that the juvenile court improperly focused solely on issues of " 'uncertainty' " because of her conduct. She contends the juvenile court should have also considered that there was uncertainty as to whether CW would remain in the current foster care placement and that the adoption would be approved. Thus, according to mother, the juvenile court should have weighed the benefits of the child's already established relationship with mother against the benefits of a possible new and undetermined future prospective adoptive placement, and, after such weighing, found that the child should be allowed to continue the existing loving relationship with mother. We see no merit to mother's argument. Mother's section 388 petition had already been denied, and properly so. The juvenile court's choice was between continuing CW in temporary foster care or terminating parental rights thereby freeing the child to be adopted. The juvenile court did not err in deciding that a permanent plan of adoption was in CW's best interests.

In sum, we conclude that the juvenile court acted within its discretion when it found that CW's "need for a safe, stable, and permanent home outweighed the benefit [the child] would derive from a continued relationship with" mother. (*Dakota H., supra,* 132 Cal.App.4th at p. 231.) Because mother failed to meet her burden of establishing a compelling reason for applying the beneficial parent-child relationship exception (§ 366.26, subd. (c)(1)(B)(i)), we must uphold the order terminating parental rights, thereby freeing CW for adoption.

**DISPOSITION**

The orders, dated July 21, 2015, are affirmed.

_____
Jenkins, J.

We concur:

15

_____
McGuiness, P. J.


_____
Siggins, J.


*In re C.W.*, A145990